CARNEY and wife, Appellants, v. FARMERS MUTUAL AUTO-
MOBILE INSURANCE COMPANY, Respondent.

*February 6—March 7, 1961.*

For the appellants there was a brief by *Duffy, Dewane, Miller & Gerlikowski* of Green Bay, and oral argument by *William J. Duffy* and *Edwin A. Gerlikowski.*

For the respondent there was a brief by *Everson, Whitney, O'Melia & Everson* of Green Bay, and oral argument by *James L. Everson.*

MARTIN, C. J.    Plaintiff William Carney is blind. From the summer of 1952 until January 11, 1959, he was the owner of a seeing-eye dog called Gabe.

On March 25, 1958, defendant issued to the plaintiffs a policy of fire insurance in the amount of $5,000 on the

household contents of a dwelling at 1619 Willow street, Green Bay. When plaintiffs moved to a home in the town of Hobart in August of 1958, there was attached to the policy an extended coverage indorsement, section 2 (3) of which covered direct loss caused by:

"Vandalism and malicious mischief, being only wilful and malicious damage to or destruction of the described property, and including damage to the building(s) covered hereunder caused by burglars."

It was stipulated by the parties that the term "property," as used in the policy, would include the dog. Three questions were submitted to the jury: (1) Whether the destruction of the dog occurred on plaintiffs' premises; (2) whether the destruction of the dog was the result of a wilful and malicious act of a person unknown; and (3) the amount of plaintiffs' damages. The jury answered the first two questions "Yes," the first of which the trial court changed to "No," on the ground that plaintiffs failed to meet the burden of proving that the dog was destroyed upon their premises.

Mr. Carney had owned Gabe since 1952, using him as a guide wherever he went, including large cities such as Boston, New York, and Chicago. Gabe was a male German shepherd; in 1959 he was seven years and nine months old and weighed about 110 pounds. The dog was highly trained, intelligent, obedient, reliable.

The dog was fed once a day; plaintiffs' custom was to feed him between 7 and 8 p. m. at the rear of the house. They testified it was his habit to eat a little, run around the trees at the edge of the yard, come back and eat some more, run again, etc. During the feeding period he was never chained. The dog would stay out five, ten, or fifteen minutes and then scratch on the screen of a window at the rear of the house so that he would be let in. On January 11, 1959, a Sunday, Mr. Carney put out the dog's food and returned

to the house almost immediately because it was cold. He waited for about fifteen minutes at the rear window and when the dog did not come to the screen he went out, listened for the dog, whistled, and called. He checked several times and later Mrs. Carney went out, looked around the yard, and whistled for the dog. They continued looking for him until about midnight. In the morning they notified the sheriff's office. On Tuesday the dog's body was found in the town dump about one mile from the Carney residence. It had been shot in the shoulder by a shotgun which, according to the expert testimony, was fired from a distance of 12 to 20 feet. Snow beneath the body had melted and then frozen, apparently because the body was warm when it fell or was placed there. There was a very small amount of blood under it. There were no blood trails or tracks in the area. There is no evidence that blood was found on plaintiffs' premises.

Gabe was a work dog. The evidence establishes that when he was working, that is, guiding his master, he was completely obedient, aloof to other dogs and other people. Mr. Carney testified that to his knowledge, while they lived in the town of Hobart, Gabe never left the premises without someone in the family with him; that on only two occasions he had left the premises when they lived on Willow street. Once he slipped his chain; the other time he was left in a car with the door open.

The Hobart residence is situated in a somewhat-rural area, there being open fields and woods to the north, northeast, east, and southeast thereof. There are three homes immediately to the south. At two of these the owners had German shepherd dogs, both female. The neighbors testified that on frequent occasions they saw Gabe in their yards and out on the road.

At the rear of the Carney yard there was a doghouse and a wire inclosure where Gabe was usually kept when

he was not in the house. But he was never chained or confined while being fed.

Plaintiffs testified in detail as to Gabe's "habits" while eating. Mr. Carney, of course, could not see whether the dog ever left the premises and Mrs. Carney, while testifying that on the occasions when she watched the dog he stayed in the yard, did not testify that she watched him every time he was feeding.

On the evening of January 11, 1959, neither of the plaintiffs stayed in the yard or watched the dog while he was feeding. When the dog did not return Mr. Carney "wasn't concerned about it. . . . I thought perhaps he had wandered off for a little bit in the back there." Thus, while plaintiffs rely on the "habit" of the dog to stay in the yard, they recognized the probability that it had "wandered off." It is also significant that, with the exception of feeding time, Gabe was kept in the kennel when not in the house, a further recognition that he might leave the premises if no one were with him.

Moreover, it is established no one heard a shot in the vicinity; there is no evidence of blood in the yard or tracks or marks of the dog's being dragged. The body was found a mile away. The evidence shows that the dog was capable of running such a distance in the space of fifteen minutes. Anyone destroying this 110-pound dog at the rear of plaintiffs' premises would have had to carry or drag the body for about 350 feet to the road or one mile to the dump, all without making a sound that would be heard in the house and without making any tracks or marks or leaving any bloodstains in the snow.

As the trial court observed, this was a case involving considerable emotion. It was natural for the jury to sympathize with plaintiffs in the loss of a valuable animal to which they were deeply attached. Sympathy, however, cannot be permitted to supply evidence which is not there or

to entitle the jury to speculate. The question was whether the destruction of the dog took place on plaintiffs' premises. There was no evidence of that. Plaintiffs attempted to raise the presumption, on evidence as to the dog's special training and habits, that it would not leave the premises and therefore must have been killed there.

"A presumption of fact is that mental process by which the existence of one fact is inferred from proof of some other fact or facts with which experience shows it is usually associated by succession or coexistence. . . . not only must the fact from which the inference is drawn be established in evidence, . . . and not rest on the accuracy of a reasoning process; but the inference to which it gives rise should, in the majority of cases, be strong and almost inevitable." 31 C. J. S., Evidence, p. 726, sec. 116.

A classic example of a presumption is that a letter properly addressed and mailed is received by the addressee. The presumption may be rebutted, but it makes a jury issue. Plaintiffs' evidence, however, failed to raise the presumption. Mr. Carney himself testified that on two occasions the dog had left the premises, and that when Gabe disappeared on January 11, 1959, he thought the dog had "wandered off." The evidence certainly fails to provide the basis for a "strong and almost inevitable" inference that the dog remained on plaintiffs' premises the night it was killed. Plaintiffs failed to meet their burden of proof and the trial court properly so held.

*By the Court.*—Judgment affirmed.